# United States Court of Appeals

## For the First Circuit

---

Nos. 01-2055
     01-2067

EDWARD B. ELLIS,

Petitioner, Appellee,

v.

UNITED STATES OF AMERICA,

Respondent, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, <u>U.S. District Judge</u>]
[Hon. Frank H. Freedman, <u>Senior U.S. District Judge</u>]

Before

Selya, <u>Circuit Judge</u>,

Coffin, <u>Senior Circuit Judge</u>,

and Howard, <u>Circuit Judge</u>.

---

<u>Daniel S. Goodman</u>, Appellate Section, Criminal Division,
United States Department of Justice, with whom <u>Michael J. Sullivan</u>,
United States Attorney, was on brief, for appellant.
     <u>John G.S. Flym</u>, by appointment of the court, for appellee.

---

December 20, 2002

---

**SELYA**, <u>Circuit Judge</u>. These appeals, which have their genesis in an effort by the petitioner, Edward B. Ellis, to mount a collateral attack on his convictions for interstate transportation of a minor with intent to engage in criminal sexual activity, present challenging legal questions complicated by a strange procedural twist. That complication arose after the original trial judge denied Ellis's section 2255 petition in part and then recused himself as to the unadjudicated portion of the petition. A limited order of reassignment followed. The transferee judge, acting partly on the basis of a previously unadjudicated claim and partly on the basis of a previously adjudicated claim, proceeded to grant the petition.

The hybrid nature of this decision requires that we review its component parts separately. The first ground of decision involves the trial judge's handling of a jury note. We agree with the transferee judge's finding of error — the original trial judge used an incorrect procedure in dealing with the jury note — but we hold that this error was harmless under the circumstances. The second ground of decision involves whether the special seating arrangement afforded to the victim during her trial testimony offended the Confrontation Clause. We hold that under the law of the case doctrine the transferee judge should not have revisited the issue, but, rather, should have left intact the

-2-

original judge's finding that no constitutional violation had occurred.

In light of these holdings, we discern no principled basis for habeas relief. Consequently, we reverse the order granting the petitioner a new trial and remand the case with directions to enter judgment for the United States.

## I.   BACKGROUND

In 1990, a jury convicted the petitioner on three counts of interstate transportation of a minor with intent to engage in criminal sexual activity. See 18 U.S.C. § 2423. The district court imposed a twenty-five year incarcerative term. On direct appeal, we affirmed the convictions and sentence. United States v. Ellis, 935 F.2d 385 (1st Cir. 1991). We suggest that those who hunger for a more exegetic account of the crimes of conviction consult that opinion.

For present purposes, it suffices to say that the petitioner was found guilty of repeatedly abusing (in three different states) the youthful daughter of his live-in girlfriend. Id. at 388-89. The evidence adduced against him included the testimony of his victim, E.D. (who was nine years old at the time of trial). In a preliminary discussion, it was suggested, without objection from the petitioner's counsel (Attorney Goldings), that E.D. testify while seated "in such a way that she does not look at [the petitioner]."

Notwithstanding his initial acquiescence, Goldings objected to the special seating arrangement when E.D. was called as a witness. Judge Freedman overruled the objection. During her testimony, E.D. sat in a chair facing the jurors but facing away from the petitioner. The parties disagree both as to the exact angle between E.D. and the petitioner and as to how much of E.D.'s face the petitioner could see during her testimony. It is clear, however, that E.D., while testifying, could only have made eye contact with the petitioner by looking over her right shoulder. It is equally clear that she did not avail herself of this opportunity.

On direct appeal, the petitioner unsuccessfully challenged the sufficiency of the evidence, various evidentiary rulings, the jury instructions, and the length of the sentence. Id. at 389-97. He did not advance any claim related either to the handling of the jury note (discussed infra) or to the special seating arrangement.

In 1997, the petitioner moved pro se to vacate his sentence. See 28 U.S.C. § 2255. In that petition, he maintained that Goldings had rendered ineffective assistance of counsel (including a failure to present certain exculpatory evidence and impedance of his right to testify); charged Goldings with having concealed a conflict of interest; lodged a Confrontation Clause challenge to the special seating arrangement; complained of

prosecutorial misbehavior; and accused Judge Freedman of judicial bias and misconduct. He also filed two motions: one seeking the appointment of counsel and the other asking Judge Freedman to step aside.

Judge Freedman denied the motion for appointment of counsel out of hand. As for the recusal motion, he did not disqualify himself generally, but, rather, proceeded to resolve four of the petitioner's five claims. Specifically, he denied the cognate ineffective assistance of counsel claims insofar as those claims touched upon the failure to present evidence and the supposed interference with the petitioner's right to testify; found no cognizable conflict of interest; and ruled that the assertions of prosecutorial misconduct were overblown. Given the present posture of the case, we need not discuss any of these rulings.

Judge Freedman's disposition of the Confrontation Clause claim requires some elaboration. For purposes of that analysis, Judge Freedman accepted, without deciding, that Goldings's failure to pursue the claim on direct appeal established ineffective assistance of counsel (and, therefore, established "cause" necessary to overcome the applicable procedural bar). Judge Freedman then discussed the relevant Supreme Court precedents and explained that, as the trial judge, he had made an individualized determination that a special accommodation was needed because E.D. would have to testify regarding the "heinous acts" of sexual abuse

-5-

that she had endured at the hands of someone who lived with her and who had threatened to kill her and her family members.  Since these facts supported the use of the special seating arrangement, Judge Freedman concluded that an appeal from the court's decision to employ the special seating arrangement would have been futile, and, therefore, that Goldings's failure to challenge the arrangement on appeal was harmless.  Accordingly, he denied both the Confrontation Clause claim and the related ineffective assistance of counsel claim.  See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993) (outlining applicable prejudice requirement); Strickland v. Washington, 466 U.S. 668, 694 (1984) (same).

Having adjudicated these four sets of claims, Judge Freedman stopped short of resolving the whole of the petition. Instead, he recused himself as to the fifth claim (the accusation of judicial bias and misconduct).  See Murchu v. United States, 926 F.2d 50, 53 n.3 (1st Cir. 1991) (suggesting "that the district judge should have recused himself as to those portions of [a] section 2255 motion which alleged judicial misconduct").  Instead, he asked the chief judge to reassign the case to a new judge to "consider and render a decision on the balance of the petitioner's claims and enter judgment accordingly on those claims as well as those addressed by this court in its Memorandum and Order entered on March 2, 1998."

The chief judge subsequently assigned the case to Judge Keeton. Judge Keeton appointed counsel to represent the petitioner and gave both parties leave to file supplementary memoranda on the allegations of judicial bias and misconduct concerning (1) the court's decision to allow a special seating arrangement; (2) certain comments and gestures supposedly made by Judge Freedman during E.D.'s testimony; and (3) Judge Freedman's handling of a note from the deliberating jury.

Following a hearing, Judge Keeton unequivocally rejected the petitioner's claims of judicial bias (finding, inter alia, that bias played no role in the establishment of the special seating arrangement, and that Judge Freedman had made no untoward comments or gestures during the trial). He concluded, however, that Judge Freedman's exchange of notes with the jury deprived the petitioner of the assistance of counsel at a critical stage of the case (and, thus, violated the Sixth Amendment).[1] Judge Keeton then opted to revisit the petitioner's already adjudicated Confrontation Clause claim. Deeming his predecessor's findings inadequate and the petitioner's view of E.D. during trial too constrained, Judge Keeton reversed the earlier ruling and declared unconstitutional the use of the special seating arrangement. Based on this pair of

---

[1]Although the handling of the jury note reflects error, not misconduct, this is an essentially semantic difference for purposes of the case at bar. What matters is that, under the limited order of reassignment, the jury note claim was properly within Judge Keeton's adjudicatory purview.

-7-

conclusions, Judge Keeton granted the section 2255 petition, set aside the convictions, and ordered a new trial.

The government thereupon filed these appeals. We treat them as one: they have been consolidated, and it would serve no useful purpose to dwell upon the technical considerations that prompted the government to file two appeals instead of one.

## II. DISCUSSION

Under 28 U.S.C. § 2255, a convict in federal custody may ask the sentencing court to vacate, set aside, or correct his sentence on the ground that the court had imposed the sentence in violation of federal law (including, of course, the Constitution). Brackett v. United States, 270 F.3d 60, 63 (1st Cir. 2001). In essence, then, section 2255 is a surrogate for the historic writ of habeas corpus. See Davis v. United States, 417 U.S. 333, 344 (1974).

When an appeal is taken from an order under 28 U.S.C. § 2255, we examine the district court's legal conclusions de novo and scrutinize its findings of fact for clear error. Familia-Consoro v. United States, 160 F.3d 761, 764-65 (1st Cir. 1998). When the district court dismisses claims without holding an evidentiary hearing, we take as true the sworn allegations of fact set forth in the petition unless those allegations are merely conclusory, contradicted by the record, or inherently incredible. Mack v.

United States, 635 F.2d 20, 26-27 (1st Cir. 1980); see also United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993).

Only the jury note and seating arrangement claims are in issue here. The petitioner has neither prosecuted a cross-appeal nor otherwise challenged Judge Freedman's disposition of his other section 2255 claims. This narrowed scope of review, together with the absence of a cross-appeal, dictates that we focus on the rulings of the successor judge. We proceed in two steps. First, we discuss Judge Keeton's assessment of the jury note claim. We then consider his assessment of the Confrontation Clause claim (concentrating, for reasons that will soon become apparent, on his authority to revisit Judge Freedman's earlier adjudication of that claim).

We preface our analysis with an acknowledgment that one court has flatly rejected the concept of partial recusal. See United States v. Feldman, 983 F.2d 144, 145 (9th Cir. 1992) ("[W]hen a judge determines that recusal is appropriate it is not within his discretion to recuse by subject matter or only as to certain issues and not others."). The majority view, however, supports the availability of such a case-management device. See, e.g., Pashaian v. Eccelston Prop., Ltd., 88 F.3d 77, 84-85 (2d Cir. 1996); United States v. Kimberlin, 781 F.2d 1247, 1258-59 (7th Cir. 1985). While we have not spoken directly to the subject, we indicated our approval of the praxis in Murchu, 926 F.2d at 53 n.3,

-9-

56-57. <u>See</u> <u>also</u> <u>Warner</u> v. <u>Rossignol</u>, 538 F.2d 910, 914 n.6 (1st Cir. 1976) (finding no loss of capacity to rule on retained issues even after recusal from other issues). Today, we make that approval explicit: we hold that a judge may, in an appropriate case, decide certain issues and recuse himself or herself as to others. This was an appropriate case, and we therefore hold that Judge Freedman's partial recusal was a valid exercise of judicial authority. Under the circumstances, it constituted a sound method of dealing with the prickly problem of balancing the demands of section 2255 — a statute that evinces a strong preference for post-conviction review by the judge who presided at the defendant's trial — with the demands of the recusal statute, 28 U.S.C. § 455(a). We add, moreover, that the chief judge responded appropriately to this partial recusal by entering a limited order of reassignment.

Although limited orders of reassignment may — as in this case — be necessary and proper, they place unaccustomed restraints on the transferee judge. When a court assumes jurisdiction for a limited purpose, it ordinarily should confine itself to that purpose. <u>Cf.</u> <u>United States</u> v. <u>Erwin</u>, 155 F.3d 818, 825 (6th Cir. 1998) (holding that a magistrate judge may not overstep the bounds of an order of reference); <u>King</u> v. <u>Ionization Int'l, Inc.</u>, 825 F.2d 1180, 1185-86 (7th Cir. 1987) (same). Observing the restrictions implied in such an order promotes the efficient operation of the

courts and facilitates the winnowing of issues throughout successive stages of litigation.  See Erwin, 155 F.3d at 825.  By the same token, courts that carefully observe the boundaries of their assignments help stabilize the decisionmaking process, assure the predictability of results, and nourish proper working relationships between judicial units.  United States v. Rivera-Martinez, 931 F.2d 148, 151 (1st Cir. 1991).  This case illustrates the wisdom of adherence to these prudential policies.

### A.  **The Jury Note**.

Judge Keeton's first ground of decision arises out of the petitioner's allegation that, three and one-half hours after jury deliberations had begun, the jurors sent Judge Freedman a note asking:  "Does it have to be unanimous to be not guilty on a [sic] indictment if the vote come [sic] out uneven?"  Without consulting either side, the judge sent back a written response stating:  "The verdict on all counts must be unanimous.  All 12 jur[ors] must agree."  Approximately thirty minutes later, the jury found the petitioner guilty on all charges.

Although Judge Keeton discerned no evidence of judicial bias or partiality in Judge Freedman's conduct, he concluded that his predecessor had erred in handling the jury note and that the ex parte exchange between judge and jury had deprived the petitioner of his Sixth Amendment right to the assistance of counsel at a critical stage in the proceedings.  He found this error

-11-

prejudicial, stating:  "Given the timing and substance of the ex parte communication, I conclude that it is likely that the trial judge's response had substantial and injurious effect or influence in determining the jury's verdict."  In this regard, he theorized that the jury could have misunderstood the comment that "[t]he verdict on <u>all</u> <u>counts</u> must be unanimous" to preclude a partial verdict, an ambiguity that consultation with counsel could have prevented.

We agree with Judge Keeton that Judge Freedman erred by failing to consult the parties before responding substantively to the deliberating jury's request for a supplementary instruction. See <u>Rogers</u> v. <u>United States</u>, 422 U.S. 35, 38-39 (1975); <u>United States</u> v. <u>Parent</u>, 954 F.2d 23, 25 (1st Cir. 1992).  The incidence of error, however, does not end our inquiry.  Because the petitioner did not raise any challenge to this supplemental instruction in his direct appeal, the claim is procedurally defaulted.  It is, therefore, unreviewable on collateral attack unless the petitioner can show (1) cause sufficient to excuse his failure to raise it on direct appeal, and (2) actual prejudice. See <u>Bousley</u> v. <u>United States</u>, 523 U.S. 614, 622 (1998); <u>Derman</u> v. <u>United States</u>, 298 F.3d 34, 45 (1st Cir. 2002).[2]

---

[2]There is arguably a further exception for evidence showing actual innocence, see <u>Bousley</u>, 523 U.S. at 622, but the petitioner does not invoke that exception here.

-12-

Judge Keeton found cause sufficient to excuse the procedural default.  We assume, for argument's sake, the supportability of that finding.  After all, the notes were not indexed on the district court's docket sheet, and the petitioner says that he did not learn of them until 1995 (when a friend discovered them in the case file).  Thus, this ground of appeal arguably was unavailable to the petitioner at the time of his direct appeal.  Cf. Satterwhite v. Texas, 486 U.S. 249, 255 (1988) (finding that mere placement of ex parte orders in court file does not yield constructive notice satisfying the Sixth Amendment).

The question reduces, therefore, to whether any cognizable prejudice resulted from the error.  Quoting Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993), Judge Keeton described the test as whether the error exerted a "substantial and injurious effect or influence in determining the jury's verdict."  The petitioner resists this description; citing United States v. Cronic, 466 U.S. 648, 659 (1984), he argues that such errors can never be harmless because they necessarily involve the denial of counsel at a critical stage of a criminal trial.  This argument lacks force.

The Supreme Court recently has emphasized how seldom circumstances arise that justify a court in presuming prejudice (and, concomitantly, in forgoing particularized inquiry into whether a denial of counsel undermined the reliability of a

-13-

judgment).  See Mickens v. Taylor, 122 S. Ct. 1237, 1241 (2002);

Bell v. Cone, 122 S. Ct. 1843, 1850-51 (2002).  We, too, have

stressed this point.  See, e.g., Scarpa v. Dubois, 38 F.3d 1, 12,

15 (1st Cir. 1994).  The only Sixth Amendment violations that fit

within this narrowly circumscribed class are those that are

pervasive in nature, permeating the entire proceeding.  See Roe v.

Flores-Ortega, 528 U.S. 470, 483 (2000) (collecting cases).  In

other words, the doctrine of per se prejudice applies to "a

wholesale denial of counsel," whereas conventional harmless error

analysis applies to a "short-term, localized denial of counsel."

Curtis v. Duval, 124 F.3d 1, 5-6 (1st Cir. 1997).

Here, the petitioner does not posit that he lacked the

effective assistance of counsel throughout the proceedings but only

at a specific point in the trial (when the jury sent the note in

question and the judge responded).  This is a difference "not of

degree but of kind" in terms of whether the court's error can be

deemed per se prejudicial.  Cone, 122 S. Ct. at 1851.  We conclude,

therefore, that prejudice cannot be presumed on the basis of the

momentary lapse that occurred in this case.[3]  Cf. Rushen v. Spain,

---

[3]The petitioner's argument is not bolstered by his reliance on
French v. Jones, 282 F.3d 893, 901 (6th Cir. 2002) (affirming the
grant of a state prisoner's habeas petition on the ground that the
state courts "unreasonably applied harmless error analysis to
French's deprivation of counsel during the supplemental
instruction").  The Supreme Court recently vacated the Sixth
Circuit's decision in French and remanded the case "for further
consideration in light of Bell v. Cone[]." Jones v. French, 122 S.
Ct. 2324 (2002).

464 U.S. 114, 117-19 & n.2 (1983) (per curiam) (holding that an ex parte discussion between judge and juror can be harmless error); Coleman v. Alabama, 399 U.S. 1, 10-11 (1970) (remanding for harmlessness determination when court had improperly denied defendant counsel at preliminary hearing).

Clarifying that there is no presumption of prejudice does not doom the petitioner's quest. It simply means that the trial court's mishandling of the jury note does not lead automatically to the vacation of his convictions. We still must decide whether the error affected his substantial rights.

Although we have left open the proper standard for gauging harmlessness when such a claim of error is raised on direct appeal, see, e.g., Parent, 954 F.2d at 25 n.5, the instant claim not only arises on collateral attack but also is procedurally defaulted. In such circumstances, it is settled in this circuit that a reviewing court must apply the "actual prejudice" standard delineated in Brecht, 507 U.S. at 637-38. See Sustache-Rivera v. United States, 221 F.3d 8, 18 (1st Cir. 2000); Curtis, 124 F.3d at 6-7.[4] This standard requires us to ask whether the error had a

---

[4]To be sure, one court has used the more rigorous "harmless beyond a reasonable doubt" standard in circumstances similar to those presented in this case. See Starr v. Lockhart, 23 F.3d 1280, 1291-92 (8th Cir. 1994). We reject that view as contrary both to circuit precedent and to the overwhelming weight of authority elsewhere. See, e.g., Bains v. Cambra, 204 F.3d 964, 976-77 (9th Cir. 2000) (collecting cases); Lyons v. Stovall, 188 F.3d 327, 335 (6th Cir. 1999); Hogue v. Johnson, 131 F.3d 466, 498-99 (5th Cir. 1997) (collecting cases).

substantial and injurious effect or influence on the outcome of the proceedings. Brecht, 507 U.S. at 637-38. In answering that query, the burden of proof as to harmlessness falls on the government. O'Neal v. McAninch, 513 U.S. 432, 438-44 (1995).

Having established the ground rules, we return to the particulars of the case at hand. Judge Keeton identified the correct test for gauging prejudice in this type of situation. In our view, however, he misapplied the test in hypothesizing that the phrase, "The verdict on all counts must be unanimous," was "subject to interpretation" in an incorrect way (i.e., that the jurors must reach unanimous agreement on all counts combined, rather than on each count separately) and that it was "likely" to have influenced the verdict. When the Brecht standard is properly applied in the context of this case, the record reflects that the government has carried the devoir of persuasion.

The impetus for the standard articulated in Brecht is that the bar should be held fairly high on post-conviction review. Such proceedings are meant to afford relief only to those who have been grievously wronged, not to those who show merely a possibility — even a reasonable possibility — of harm. See Brecht, 507 U.S. at 637; see also Singleton v. United States, 26 F.3d 233, 237 n.9 (1st Cir. 1994). This applies with even greater force to procedurally defaulted claims raised for the first time on collateral review. See United States v. Frady, 456 U.S. 152, 166 (1982) (requiring

-16-

such claims to clear a significantly higher hurdle on collateral attack than on direct review); Knight v. United States, 37 F.3d 769, 772-73 (1st Cir. 1994) (same).

The bottom line is that a court cannot grant collateral relief on "mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." Calderon v. Coleman, 525 U.S. 141, 146 (1998). The error identified by Judge Keeton does not pass through this screen; our review of the instant record convinces us that it is highly improbable that the ex parte supplemental instruction had any effect on the verdict.

A jury instruction cannot be read in a vacuum, but, rather, must be taken in light of the charge as a whole. See Cupp v. Naughten, 414 U.S. 141, 146-47 (1973); United States v. Cintolo, 818 F.2d 980, 1003 (1st Cir. 1987). In this instance, the jurors previously had received explicit instruction that "[i]t's possible that you could find the government has proved its case as to all three counts, failed to prove it as to all three counts, or proved it as to one or more counts and not on the others." In framing the question to which Judge Freedman responded, the jurors asked, "Does it have to be unanimous to be not guilty on a indictment . . . ?" This use of the article "a" indicates that they understood the court's earlier instruction. Because the context in which the jurors asked for supplemental instructions strongly suggests that

they understood the independence of each count, we deem it highly probable that the jury interpreted the trial judge's relatively simple reply in the manner in which it was intended: as an admonition that, to render a verdict on any count, the jury must be unanimous as to that count. See Boyde v. California, 494 U.S. 370, 381-82 (1990) (employing similar analysis on direct review); Curtis, 124 F.3d at 8 (using comparable inquiry to assess allegedly improper jury instruction).

Nor does the timing of the verdict counsel persuasively in favor of a different conclusion. In some cases, a time line permits a reasonable inference that the error "had a causal effect on a verdict returned within minutes of the court's action." Curtis, 124 F.3d at 7 n.2. Here, however, we do not think that much weight can be placed on the fact that the jury returned its verdict some thirty-five minutes after Judge Freedman's response. We must consider the timing in the gross and scope of the entire record. See Derman, 298 F.3d at 46. The record reveals that the jury deliberated for only four hours in total. In that relatively short period, this was the deliberating jury's third note; in other words, it asked for, and received, two other responses during that interval. When put in this context, a third question more than half an hour before reaching a verdict does not strike us as significant.

We are fortified in our conclusion that the error was benign by the strength of the prosecution's case. The government adduced more than adequate evidence to support the jury's verdict on all three counts. As we stated on direct review, the evidence of the petitioner's guilt "was overwhelming." Ellis, 935 F.2d at 390. Any suspicion that the supplemental instruction improperly drove the verdict is therefore highly implausible. See United States v. Bullard, 37 F.3d 765, 768 (1st Cir. 1994); Rogers v. Carver, 833 F.2d 379, 385 n.1 (1st Cir. 1987).

To sum up, the petitioner's argument that the supplemental instruction tipped the scales is woven from gossamer strands of speculation and surmise. Notwithstanding the error, we remain confident of the integrity of the verdict — especially in view of the apparent clarity of the charge as a whole and the robust evidence of the petitioner's guilt. Consequently, we find no actual prejudice. See Calderon, 525 U.S. at 146; Brecht, 507 U.S. at 637. It follows that Judge Keeton's first ground of decision does not justify habeas relief.

### B. **The Confrontation Clause Claim**.

While the resolution of the jury note claim was plainly within the transferee judge's adjudicatory purview, the Confrontation Clause claim arguably was not. We briefly recapitulate the relevant facts (which are uncontradicted). After resolving the majority of the petitioner's section 2255 claims

(including the Confrontation Clause claim), Judge Freedman granted in part the petitioner's motion to recuse and transferred the case so that another judge could hear and determine the fifth claim for relief (alleging judicial bias and misconduct). The successor judge resolved all the transferred claims against the petitioner (save only for the jury note claim, discussed supra). Yet, notwithstanding the limited scope of the transfer order, he ventured into other areas. Once there, he reconsidered, and overruled, his predecessor's prior adjudication of the Confrontation Clause claim. The government says that Judge Keeton exceeded his authority in revisiting that claim. The petitioner demurs.

This conundrum implicates the law of the case doctrine. This doctrine has two branches. One branch involves the so-called mandate rule (which, with only a few exceptions, forbids a lower court from relitigating issues that previously were decided — or could have been decided — by a higher court at an earlier stage of the same case). See, e.g., United States v. Bell, 988 F.2d 247, 250 (1st Cir. 1993); Rivera-Martinez, 931 F.2d at 150. The other branch, applicable here, is somewhat more flexible. It provides that "unless corrected by an appellate tribunal, a legal decision made at one stage of a civil or criminal case constitutes the law of the case throughout the pendency of the litigation." Flibotte v. Pa. Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir. 1997). This

means that a court ordinarily ought to respect and follow its own rulings, made earlier in the same case. See Arizona v. California, 460 U.S. 605, 618 (1983) (explaining that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). This branch of the doctrine frowns upon, but does not altogether prohibit, reconsideration of orders within a single proceeding by a successor judge. E.g., Flibotte, 131 F.3d at 25. This appeal requires us to trace the contours of the exceptions that apply to this second branch of the law of the case doctrine.

The presumption, of course, is that a successor judge should respect the law of the case. The orderly functioning of the judicial process requires that judges of coordinate jurisdiction honor one another's orders and revisit them only in special circumstances. See Stevenson v. Four Winds Travel, Inc., 462 F.2d 899, 904-05 (5th Cir. 1972) (collecting cases); TCF Film Corp. v. Gourley, 240 F.2d 711, 713-14 & n.2 (3d Cir. 1957) (collecting cases); 18B Charles A. Wright et al., Federal Practice and Procedure § 4478, at 670 (2d ed. 2002). This limitation is anchored in a sea of salutary policies. See generally Joan Steinman, Law of the Case: A Judicial Puzzle in Consolidated and Transferred Cases and in Multidistrict Litigation, 135 U. Pa. L. Rev. 595, 602-05 (1987). For one thing, the law of the case doctrine affords litigants a high degree of certainty as to what

claims are — and are not — still open for adjudication. See Best v. Shell Oil Co., 107 F.3d 544, 546 (7th Cir. 1997); see also Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816-17 (1988). For another thing, it furthers the abiding interest shared by both litigants and the public in finality and repose. See Wyoming v. Oklahoma, 502 U.S. 437, 446 (1992). Third, it promotes efficiency; a party should be allowed his day in court, but going beyond that point deprives others of their days in court, squanders judicial resources, and breeds undue delay. See Christianson, 486 U.S. at 819; Rivera-Martinez, 931 F.2d at 151. Fourth, the doctrine increases confidence in the adjudicatory process: reconsideration of previously litigated issues, absent strong justification, spawns inconsistency and threatens the reputation of the judicial system. See Geoffrey C. Hazard, Jr., Preclusion as to Issues of Law:  The Legal System's Interest, 70 Iowa L. Rev. 81, 88 (1984) (collecting cases). Finally, judges who too liberally second-guess their co-equals effectively usurp the appellate function and embolden litigants to engage in judge-shopping and similar forms of arbitrage. See Erwin, 155 F.3d at 825; see also White v. Higgins, 116 F.2d 312, 317-18 (1st Cir. 1940); 18B Wright et al., supra § 4478.1, at 695.

These concerns are heightened in the federal habeas context.  In the first place, the presumption against reconsideration is even stronger when the challenge arises on

-22-

collateral attack of a criminal conviction (and, therefore, implicates society's reasonable reliance on the finality of a criminal conviction). See Strickland, 466 U.S. at 697 (observing that "the presumption that a criminal judgment is final is at its strongest in collateral attacks"). In the second place, a section 2255 petition ordinarily must be brought before the trial judge. See 28 U.S.C. § 2255; see also Gregory v. United States, 585 F.2d 548, 550 (1st Cir. 1978). This is not an idle gesture, for that judge has a unique knowledge of what transpired at trial and of what effect errors may have had. See McGill, 11 F.3d at 225; Panico v. United States, 412 F.2d 1151, 1155-56 (2d Cir. 1969); see also Rule 4(a), Rules Governing Sec. 2255, advisory committee's note. For these reasons, a successor judge should be particularly hesitant to revisit portions of a section 2255 petition already adjudicated before the original trial judge. This is especially so in a case — like this one — in which the successor judge is operating under a limited transfer order.

Even so, there are times when the law of the case may give way. The question of what circumstances justify revisiting a ruling previously made in the same proceeding by a judge of coordinate jurisdiction is case-specific. Christianson, 486 U.S. at 817; TCF Film Corp., 240 F.2d at 714. The resolution of that question is guided, however, by certain general principles. We enumerate those principles.

-23-

First, reconsideration is proper if the initial ruling was made on an inadequate record or was designed to be preliminary or tentative.  E.g., Peterson v. Lindner, 765 F.2d 698, 704 (7th Cir. 1985); cf. Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C., 212 F.3d 157, 160 (3d Cir. 2000) (emphasizing district court's authority to reconsider matters previously decided on preliminary injunction).  Second, reconsideration may be warranted if there has been a material change in controlling law.  E.g., Tracey v. United States, 739 F.2d 679, 682 (1st Cir. 1984); Crane Co. v. Am. Standard, Inc., 603 F.2d 244, 248 (2d Cir. 1979).  Third, reconsideration may be undertaken if newly discovered evidence bears on the question.  E.g., Fisher v. Trainor, 242 F.3d 24, 29 n.5 (1st Cir. 2001); Pit River Home & Agric. Coop. Ass'n v. United States, 30 F.3d 1088, 1096 (9th Cir. 1994).  Lastly, reconsideration may be appropriate to avoid manifest injustice.  Christianson, 486 U.S. at 817.  In that regard, however, neither doubt about the correctness of a predecessor judge's rulings nor a belief that the litigant may be able to make a more convincing argument the second time around will suffice to justify reconsideration.  See Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir. 1981); White, 116 F.2d at 317-18.  For this purpose, there is a meaningful difference between an arguably erroneous ruling (which does not justify revisitation by a co-equal successor judge) and an

unreasonable ruling that paves the way for a manifestly unjust result.

We employ this framework in assessing Judge Keeton's decision to revisit Judge Freedman's adjudication of the petitioner's Confrontation Clause claim. In so doing, we recognize the desirability of according the successor judge a modicum of flexibility. Thus, we review a successor judge's decision to reconsider a coordinate judge's earlier ruling for abuse of discretion. Delta Sav. Bank v. United States, 265 F.3d 1017, 1027 (9th Cir. 2001); Loumar, Inc. v. Smith, 698 F.2d 759, 763 (5th Cir. 1983).

Judge Keeton did not say why he opted to reopen the Confrontation Clause issue. It is apparent, however, that the first three conditions that might justify reconsideration are plainly absent here. Judge Freedman made his Confrontation Clause ruling based on full briefing, oral argument, and an examination of the record as a whole (the same record that was before Judge Keeton). In addition, he had the advantage of having presided over the trial and having witnessed the child's testimony at first hand. His rescript, filed on March 2, 1998, gives no indication that his Confrontation Clause ruling was meant to be tentative or preliminary. To the contrary, he instructed Judge Keeton to enter it as part of the final judgment upon completion of the proceedings, thereby signaling that he intended his ruling to be

definitive. Finally, the petitioner neither presented new facts before Judge Keeton nor identified any intervening change in the law.

In short, the record fails to suggest any reason why Judge Keeton should have revisited Judge Freedman's Confrontation Clause ruling unless he discerned a manifest injustice. That standard is difficult to achieve: a finding of manifest injustice requires a definite and firm conviction that a prior ruling on a material matter is unreasonable or obviously wrong.[5] See Arizona, 460 U.S. at 618 n.8; see also Dobbs v. Zant, 506 U.S. 357, 358-59 (1993) (indicating that the previous ruling must be called into "serious question"); Reed v. Rhodes, 179 F.3d 453, 473 (6th Cir. 1999) (finding that reconsideration did not constitute abuse of discretion when original judge's ruling was ill-explained and based on obviously unsound legal analysis). A mere "doctrinal disposition" to decide the issue differently will not suffice. Agostini v. Felton, 521 U.S. 203, 236 (1997).

We have examined the record with great care. Fairly viewed, the special seating arrangement devised by Judge Freedman for the victim's testimony was not obviously outside the compass of

---

[5]A finding of manifest injustice also requires a finding of prejudice. Dobbs v. Zant, 506 U.S. 357, 359 (1993); United States v. Crooker, 729 F.2d 889, 890 (1st Cir. 1984). Because we conclude that Judge Freedman's refusal to grant habeas relief premised on the use of the special seating arrangement was neither unreasonable nor obviously wrong, see text infra, we do not reach the question of what (if any) prejudice inured.

Supreme Court precedent.  Because the record does not support a finding of manifest injustice, Judge Keeton was bound to defer to Judge Freedman's ruling on that issue.  His failure to do so constitutes an abuse of discretion.

To begin, it is important to set the stage (and, thus, establish the appropriate frame of reference).  The petitioner concedes that he failed to advance, on direct appeal, his claim that the special seating arrangement violated the Confrontation Clause.  Accordingly, the claim is procedurally defaulted.  In order to have succeeded on a collateral attack, therefore, he had to have shown both cause and prejudice.  See McCleskey v. Zant, 499 U.S. 467, 493 (1991); Derman, 298 F.3d at 45.  Assuming, without deciding, that the petitioner had demonstrated cause sufficient to excuse his procedural default — a debatable proposition on this record — he still had to demonstrate a reasonable probability that, but for his counsel's failure to raise the Confrontation Clause issue on direct appeal, the outcome of that appeal would have been different.  See Strickler v. Greene, 527 U.S. 263, 289 (1999).  Phrased another way, he had to show that his attorney's alleged blunder worked to his actual and substantial disadvantage, thereby undermining confidence in the fairness of the proceedings that

culminated in his conviction.[6] <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 434 (1995); <u>Frady</u>, 456 U.S. at 170.

Next, we knit the cause and prejudice standard and the manifest injustice standard together. Judge Freedman found no error in the use of the special seating arrangement (and, thus, no prejudice). In order to revisit and reverse that ruling, Judge Keeton had to determine that Judge Freedman's finding was manifestly unjust (that is, that the finding was unreasonable or obviously wrong). It is that determination, necessarily implicit in Judge Keeton's actions, that we must review.

Our inquiry is channeled by a pair of Supreme Court opinions. Two years before the petitioner's conviction, the Court held unconstitutional, as violative of a defendant's Sixth Amendment right to confrontation, an Iowa statute that allowed the placement of an opaque screen between a defendant charged with sexual assault and his minor victims (there, two thirteen-year-old girls). <u>Coy</u> v. <u>Iowa</u>, 487 U.S. 1012, 1020-21 (1988). Although the Court described face-to-face confrontation as instrumental in testing the veracity of a witness and integral to a fair trial, <u>id.</u>

---

[6]Because the quantum and kind of prejudice that must be shown in connection with an ineffective assistance of counsel claim is identical to that necessary to relieve a habeas petitioner from the effects of a procedural default, <u>see</u> <u>Prou</u> v. <u>United States</u>, 199 F.3d 37, 49 (1st Cir. 1999), we have no need to undertake a separate analysis of the petitioner's ineffective assistance of appellate counsel claim. <u>See</u> <u>Strickland</u>, 466 U.S. at 694 (holding that prejudice is an essential element of an ineffective assistance of counsel claim); <u>Scarpa</u>, 38 F.3d at 14-15 (same).

at 1016-20, it specifically reserved the question of whether exceptions to the right of face-to-face confrontation might be recognized when "necessary to further an important public policy," id. at 1021. To the extent that such exceptions might exist, the Court cautioned, they could not rest on generalized theses (such as those contained in the Iowa statute); rather, exceptions would require "individualized findings" as to particular witnesses and circumstances. Id.

Six weeks after the jury convicted the petitioner, the Supreme Court decided Maryland v. Craig, 497 U.S. 836 (1990). The Craig Court upheld a Maryland statute that allowed child abuse victims to testify via one-way closed circuit television upon the trial court's determination that face-to-face confrontation with the alleged abuser was likely to cause serious emotional distress. Id. at 855. Justice O'Connor, writing for the majority, emphasized that the right to face-to-face confrontation is not an absolute requirement of the Confrontation Clause. Id. at 847-50. An alternative arrangement is permissible as long as the arrangement is in furtherance of an important public policy — such as the protection of minors who have been victimized by sexual predators — and the reliability of the testimony is otherwise assured. Id. at 854-55. Even so, the trial court must make individualized, case-specific findings, and, in doing so, must address the

particular child's susceptibility to the particular defendant.  Id.
at 855-60.

In addressing the section 2255 petition, Judge Freedman
reviewed these precedents.  He concluded that the special seating
arrangement used in the petitioner's trial passed constitutional
muster.  Based on his supportable findings anent the need for
special treatment of the child witness, this conclusion is neither
unreasonable nor obviously wrong.

In his post-conviction rescript, Judge Freedman carefully
documented the considerations that had prompted him to resort to a
modified seating arrangement.[7]  He found that, given the nature of
E.D.'s testimony, the child — who was nine years old at the time of
trial — likely would have difficulty testifying in a public forum,
and that she might reasonably fear testifying in front of the
petitioner.

The petitioner asserts that Judge Freedman's findings are
inadequate to meet the Craig criteria.  While this is a close
question, we think that the findings suffice to withstand a claim

---

[7]Although Judge Freedman and the parties discussed E.D.'s
seating arrangement at a conference in advance of the criminal
trial, the judge neither conducted a hearing on the matter nor made
contemporaneous findings as to the effect of the petitioner's
presence on E.D.  Since the petitioner did not request a hearing
and did not object to the lack of contemporaneous findings, we
accept Judge Freedman's later statement of his reasons in lieu of
contemporaneous findings.  Cf. California v. Sharp, 36 Cal. Rptr.
2d 117, 124 & n.4 (Cal. Ct. App. 1994) (extrapolating findings from
the record where defendant failed to ask the trial court for
findings).

of manifest injustice. In the first place, the less the intrusion on Sixth Amendment rights, the less detail is required in a trial court's findings. See California v. Lord, 36 Cal. Rptr. 2d 453, 455 (Cal. Ct. App. 1994); Brandon v. Alaska, 839 P.2d 400, 409-10 (Alaska Ct. App. 1992). In all events, Judge Freedman's rescript mentions specifically that the petitioner had threatened E.D. with harm if she told what he had done. This finding, in conjunction with other facts of record (such as the fact that the petitioner arguably had made menacing gestures during the pretrial proceedings, that he had struck E.D. before, and that he repeatedly had violated a "no contact" order after his arrest), leads us to conclude that the use of a special seating arrangement was justified. See Vigil v. Tansy, 917 F.2d 1277, 1279-80 (10th Cir. 1990) (allowing pre-Craig trial court to justify moderate restriction on right to confront child witness on less rigorous individualized findings).[8]

In our view, the adequacy of Judge Freedman's findings is buttressed by the hallmarks of testimonial reliability made

---

[8]To be sure, Judge Freedman's findings fell short of an express determination that E.D. ran a serious risk of trauma from testifying in front of the defendant — a type of determination suggested by Craig, 497 U.S. at 856. Given that the petitioner's conviction pre-dated Craig, however, we think that the findings were adequate to justify the modest measures instituted in this case. See Hardy v. Wigginton, 922 F.2d 294, 299-300 (6th Cir. 1990) (explaining that, in the interim between Coy and Craig, trial courts could not be expected to make Craig-type findings that were complete in every detail); Vigil, 917 F.2d at 1279-80 (similar).

manifest by the record. See Craig, 497 U.S. at 851 (listing competence, administration of an oath, full opportunity for cross-examination, and full visibility of the child witness's body language and demeanor before judge, jury, and defendant as "other elements of the confrontation right"). These include the absence of any opaque physical barrier and the fact that the witness was required to give live testimony, under oath, in the presence of both the defendant and the jury. See id. To the extent that nervousness, body language, demeanor, and the like are important indicia of credibility, the jurors' entirely unimpaired view of the witness is persuasive. See Morales v. Artuz, 281 F.3d 55, 62 (2d Cir. 2002); Stanger v. Indiana, 545 N.E.2d 1105, 1113 (Ind. Ct. App. 1989). In addition, the petitioner had ample opportunity to cross-examine E.D. and to offer any evidence and arguments that might impugn her credibility. These are weighty factors. See Louisiana v. Brockel, 733 So. 2d 640, 646 (La. Ct. App. 1999); Boatright v. Georgia, 385 S.E.2d 298, 302-03 (Ga. Ct. App. 1989).

Despite these circumstances, the petitioner argues that Coy demands a different result. We do not agree. The seating arrangement there was statutorily driven, not custom-tailored to fit the exigencies of a particular case. Moreover, it involved an opaque physical barrier. In contrast, no physical barrier separated E.D. from the petitioner during the instant trial. Many courts have found the absence of such a barrier to be of decretory

significance in rejecting Confrontation Clause challenges.  See,
e.g., N. Dakota v. Miller, 631 N.W.2d 587, 594 (N.D. 2001); Smith
v. Arkansas, 8 S.W.3d 534, 537 (Ark. 2000); Utah v. Hoyt, 806 P.2d
204, 209 (Utah Ct. App. 1991); Ortiz v. Georgia, 374 S.E.2d 92, 95-
96 (Ga. Ct. App. 1988); see also Morales, 281 F.3d at 58-59
(pointing out that neither Craig nor Coy expatiate on unobstructed,
in-court testimony); Cumbie v. Singletary, 991 F.2d 715, 721 (11th
Cir. 1993) (suggesting that Coy is inapplicable when child
testifies in presence of defendant); see generally Bruce E.
Bohlman, The High Cost of Constitutional Rights in Child Abuse
Cases — Is the Price Worth Paying?, 66 N.D. L. Rev. 579, 589 (1990)
(stating that seating arrangements not involving artificial
barriers "are apparently permissible under Coy").  Given these
marked differences, Coy is readily distinguishable.

        Nor are these the only bases for distinction.  Unlike in
Coy, the record here contains no evidence suggesting that what the
petitioner actually saw of E.D.'s face at trial was substantially
less than what he would have seen had she testified from the
witness stand (and, indeed, Judge Freedman's description of the
courtroom layout makes clear that E.D. would not have had to face
the petitioner directly even if she had testified from the witness
stand).  The significance of this circumstance is reinforced by
Judge Freedman's specific finding that the petitioner had a
sufficient view of E.D.'s "demeanor."  This finding is not clearly

erroneous, and, thus, deserves our respect. See Familia-Consoro, 160 F.3d at 764-65; McGill, 11 F.3d at 225. Both of these factors tend to support the constitutionality of the special seating arrangement. See Smith, 8 S.W.3d at 537-38 (collecting cases); Brockel, 733 So. 2d at 646.

In a further effort to denigrate the use of the special seating arrangement, the petitioner notes the lack of eye contact between him and E.D. We agree that the opportunity for eye contact, whether or not the witness chooses to act on it, is an important integer in the Sixth Amendment calculus. Coy, 487 U.S. at 1019. But a defendant does not have a constitutional right to force eye contact with his accuser, id., and we refuse to fashion a bright-line rule that the lack of such an opportunity, in and of itself, automatically translates into a constitutional violation. Most other courts that have considered the question have reached a similar conclusion.[9] E.g., Hoyt, 806 P.2d at 210; Ortiz, 374 S.E.2d at 95-96. Moreover, some courts have found that the lack of an easy opportunity for eye contact is palliated to a sufficient

---

[9]We are aware that the Massachusetts Supreme Judicial Court has found the lack of eye contact fatal under an analogous — but differently worded — provision of the Massachusetts Declaration of Rights. See Massachusetts v. Amirault, 677 N.E.2d 652, 662 (Mass. 1997) (terming it "a non sequitur to argue from the proposition that, because the witness cannot be forced to look at the accused during his face-to-face testimony, that therefore this aspect of the art. 12 confrontation right is dispensable"). We decline to import so rigid a requirement into the jurisprudence of the Sixth Amendment.

degree by a seating arrangement such as the one employed in this case (which preserves the line of sight and allows a witness to turn to make eye contact with the defendant). See California v. Sharp, 36 Cal. Rptr. 2d 117, 125 (Cal. Ct. App. 1994); Boatright, 385 S.E.2d at 301.

We summarize succinctly. Although the lack of eye contact weighs in the petitioner's favor, all the other Confrontation Clause safeguards were present here. Mindful, as we are, that trial judges have some leeway to move a witness around a courtroom as long as those shifts retain an unobstructed line of sight between the defendant and the witness, cf. Coy, 487 U.S. at 1023 (O'Connor, J., concurring) (suggesting that "many such procedures may raise no substantial Confrontation Clause problem since they involve testimony in the presence of the defendant"), we cannot say that Judge Freedman's core conclusion — that no Confrontation Clause violation occurred — was either unreasonable or obviously wrong.

In a further attempt to justify reconsideration, the petitioner submits that Judge Freedman erroneously denied him the assistance of counsel for his section 2255 petition. He argues, in effect, that his "inartful" pro se presentation before Judge Freedman may have influenced the court's rulings, freeing the successor judge to review them de novo. That argument is unavailing. A convicted criminal has no constitutional right to

counsel with respect to habeas proceedings.  Pennsylvania v. Finley, 481 U.S. 551, 555 (1987).  It is true that the petitioner could not raise his ineffective assistance of counsel claim until collateral review, see Knight, 37 F.3d at 774; United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993), but this makes no difference.  We fail to see how an adscititious ineffective assistance claim entitles a criminal defendant to the assistance of counsel on subsequent collateral review.  See Moran v. McDaniel, 80 F.3d 1261, 1271 (9th Cir. 1996); see also Lattimore v. Dubois, 311 F.3d 46, 55-56 (1st Cir. 2002).  Although we have indicated that, in certain circumstances, the appointment of counsel for a section 2255 petitioner might be warranted, such cases are few and far between.  See Mala, 7 F.3d at 1063-64.  The circumstances of the petitioner's case are not such as to demand the appointment of counsel.[10]  It follows that Judge Keeton could not reconsider a prior ruling merely because the presence of counsel might have produced new or better arguments.  United States v. Velez Carrero, 140 F.3d 327, 329-30 (1st Cir. 1998).

---

[10]The fact that Judge Keeton appointed counsel to handle the remainder of the petitioner's claims is not dispositive.  While such an appointment was within Judge Keeton's discretion, it does not follow that Judge Freedman's contrary decision constituted an abuse of discretion.  This variation merely serves to illustrate what every lawyer already knows:  that two judges can decide discretionary matters differently without either judge abusing his or her discretion.  See, e.g., United States v. Nickens, 955 F.2d 112, 125-26 (1st Cir. 1992); Williams v. Giant Eagle Mkts., Inc., 883 F.2d 1184, 1190 (3d Cir. 1989); United States v. Stubblefield, 408 F.2d 309, 311 (6th Cir. 1969).

We need go no further. Finding no manifest injustice, we are constrained to hold that Judge Keeton abused his discretion in redeciding and countermanding Judge Freedman's previous adjudication of the Confrontation Clause claim.

## III. CONCLUSION

Although it is true that the law must always be vigilant to protect the rights of those who are convicted of serious crimes, our system of justice guarantees a fair trial, not a perfect one. See United States v. Hasting, 461 U.S. 499, 508 (1983); United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988). Nowhere is this principle more venerated than on collateral review. See, e.g., Williams v. Taylor, 529 U.S. 362, 374-75 (2000) (holding that habeas relief under the AEDPA, 28 U.S.C. § 2254(d)(2), is reserved for unreasonable applications of Supreme Court precedent, not merely to remedy incorrect state court decisions). In this instance, the petitioner's trial may not have been perfect, but it was most assuredly fair. Accordingly, we reverse the order granting a new trial and remand the matter to the district court with directions to enter judgment for the United States and, concomitantly, to reinstate the petitioner's convictions.

**Reversed**.